```
UNITED STATES DISTRICT COURT              (ECF)
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
M.S. and L.S., individually and      :
collectively and on behalf of D.S.,:
                                     :  09 Civ. 4454 (LAK) (JCF)
            Plaintiff,               :
                                     :        REPORT AND
      - against -                    :     RECOMMENDATION
                                     :
NEW YORK CITY DEPARTMENT OF          :
EDUCATION,                           :
                                     :
            Defendant.               :
- - - - - - - - - - - - - - - - - - -:
```

TO THE HONORABLE LEWIS A. KAPLAN, U.S.D.J.:

    M.S. and L.S. are the parents of D.S., a child with autism.
They bring this action under the Individuals with Disabilities
Education Improvement Act (the "IDEA" or "IDEIA"),[1] 20 U.S.C. §
1400 et seq. and applicable New York law, against the New York City
Department of Education (the "DOE"). They seek review of a
decision by a State Review Officer ("SRO") denying them tuition
reimbursement for the private school to which they sent D.S. during
the 2007-2008 school year. The parties have cross-moved for
summary judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons that follow, I recommend that the
defendant's motion be granted and the plaintiffs' motion be denied.

---

    [1] In 2004, Congress re-authorized the Individuals with
Disabilities Education Act ("IDEA") as the Individuals with
Disabilities Education Improvement Act of 2004 ("IDEIA"), which
took effect on July 1, 2005. Lillbask ex rel. Mauclaire v.
Connecticut Department of Education, 397 F.3d 77, 80 n.1 (2d Cir.
2005); Student X v. New York City Department of Education, No. 07
CV 2316, 2008 WL 4890440, at *1 n.1 (E.D.N.Y. Oct. 30, 2008).

Background

    A.   Statutory Framework

    The IDEA requires states that receive federal funding to make a "free appropriate public education" ("FAPE") available to all children with disabilities who reside in the state. Forest Grove School District v. T.A., ___ U.S. ___, ___, 129 S. Ct. 2484, 2487 (2009) (citing 20 U.S.C. § 1412(a)(1)(A)). The Act "seeks to 'open the door of public education to handicapped children.'" Connor ex rel. I.C. v. New York City Department of Education, No. 08 Civ. 7710, 2009 WL 3335760, at *2 (S.D.N.Y. Oct. 13, 2009) (quoting Board of Education of Hendrick Hudson Central School District v. Rowley, 458 U.S. 176, 192 (1982)). Its purpose is "'to bring previously excluded handicapped children into the public education systems of the States and to require the States to adopt procedures which would result in individualized consideration of and instruction for each child.'" Id. (quoting Rowley, 458 U.S. at 189). A FAPE "must consist of 'educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction.'" Id. (quoting Rowley, 458 U.S. at 188-89).

    "The educational needs of a disabled child and his corresponding required services [("related services")] must be set

forth in an [Individualized Education Program]" ("IEP"). Id. at *3; accord Board of Education of the City School District of the City of New York v. Mills ex rel. M.S., No. 03 Civ. 0050, 2005 WL 1618765, at *1 (S.D.N.Y. July 11, 2005). New York has assigned responsibility for developing IEPs to local Committees on Special Education ("CSE"). Walczak v. Florida Union Free School District, 142 F.3d 119, 123 (2d Cir. 1998).

Parents in New York who are dissatisfied with a proposed IEP may request, pursuant to IDEA-mandated procedures, review of the IEP before an impartial hearing officer ("IHO"), who is appointed by the board of education. N.Y. Educ. Law § 4404(1); Student X, 2008 WL 4890440, at *2. After the IHO has issued a decision, an aggrieved party may appeal to a SRO. N.Y. Educ. Law § 4404(2); Student X, 2008 WL 4890440, at *2. The SRO's decision may then be appealed in state or federal court. 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3); Student X, 2008 WL 4890440, at *2.

B.    Facts

D.S. was born on May 6, 2002. (Tr. at 606).[2] He has been classified as autistic by the DOE. (Final Notice of Recommendation of New York City Board of Education dated June 14, 2007 ("Final Notice"), Pl. Exh. D;[3] New York City Board of Education IEP dated

---

[2] "Tr." refers to the transcript of the hearing conducted before the IHO.

[3] "Exh." refers to exhibits introduced by the parties at the hearing before the IHO.

June 4, 2007 ("6/4/07 IEP"), Def. Exh. 4, at 1; Plaintiff's Notice
of Motion for Summary Judgment Rule 56.1 Statement of Material
Facts Not in Dispute ("Pl. Facts"), ¶ 1; Defendant's Local Rule
56.1 Statement of Undisputed Facts ("Def. Facts"), ¶ 1).[4] He has
also been diagnosed with verbal apraxia,[5] severe auditory
processing disorder, and a severe sensory processing dysfunction.
(Neurodevelopmental Reevaluation dated Nov. 1, 2006 ("11/1/06
Evaluation"), Def. Exh. 8, at 1; Speech and Language Progress
Report dated Dec. 9, 2006 ("12/9/06 Evaluation"), Def. Exh. 9, at
1).

When D.S. was 18 months old, he received occupational therapy,
speech-language therapy, physical therapy, play therapy, and 20

---

[4] The Second Circuit has noted that Rule 56.1 Statements serve
a different purpose in IDEA cases than they do in typical cases
where a summary judgment motion has been made. See T.Y. ex rel.
T.Y. v. New York City Department of Education, 584 F.3d 412, 418
(2d Cir. 2009). In most other cases, the purpose of the Rule 56.1
Statement is to help the court easily identify disputed issues of
material fact, and a "nonmoving party's failure to respond to a
Rule 56.1 statement permits the court to conclude that the facts
asserted in the statement are uncontested and admissible." Id. at
417-18. "A summary judgment approach to IDEA cases, however, is
different. Instead of dispute resolution, a motion for summary
judgment can serve as an aid to the court within a statutory scheme
whose purpose is to ensure that children with disabilities receive
the educational benefits to which they are entitled." Id. at 418.
Thus, while a Rule 56.1 Statement "may assist the court's inquiry
into whether IDEA procedures were followed and whether the result
was reasonably designed to confer educational benefits. . . , it is
not in and of itself dispositive." Id. at 418.

[5] Apraxia is "[a] disorder of voluntary movement, consisting
of impairment in the performance of skilled or purposeful
movements." Stedman's Medical Dictionary 117 (27th ed. 2000).

hours of special education instruction through the DOE's Early
Intervention Program. (Tr. at 608; Decision of a State Review
Officer of The State Education Department of The University of the
State of New York dated January 9, 2009 (the "SRO Decision") at 1-
2). His instruction involved various techniques, including Applied
Behavior Analysis ("ABA").[6] (SRO Decision at 2; Pl. Facts, ¶ 2;
Defendant's Memorandum of Law in Support of its Motion for Summary
Judgment at 11). By the time D.S. was about 24 months old, ABA was
the only technique being used with him. (Tr. at 609). When D.S.
aged out of the DOE's Early Intervention Program, he was receiving
40 hours of special education itinerant instruction,[7] which were
devoted to ABA therapy; additionally, he received five 60-minute
sessions of speech-language therapy, five 60-minute sessions of
occupational therapy, and two 60-minute sessions of physical
therapy per week. (Tr. at 609; SRO Decision at 2).

---

[6] ABA therapy "uses reinforcement strategies to increase
socially appropriate behavior . . . and decrease socially
maladaptive behavior[]." (Tr. at 445). It breaks skills down
"into small steps or components, and learners are provided many
repeated opportunities to learn and practice skills in a variety of
settings, with abundant positive reinforcement." Autism Speaks,
What to do About it, Treatments for Autism,
http://www.autismspeaks.org/whattodo/index.php#aba (last visited
March 3, 2010). (Tr. at 192, 445-46).

[7] Special education itinerant services are board-approved
programs "provided by a certified special education
teacher . . . ." N.Y. Educ. Law § 4410(2)(K). They are to be
provided to disabled preschool children in New York "in a manner
which is necessary and cost efficient, and in the least restrictive
environment . . . ." N.Y. Educ. Law § 4410(13).

During the 2005-2006 and 2006-2007 school years, the DOE's Committee on Preschool Special Education (the "CPSE") provided D.S. with 35 hours of special education itinerant instruction[8] (which consisted of instruction using the ABA methodology) in addition to five 60-minute sessions of speech-language therapy, five 60-minute sessions of occupational therapy, and three 60-minute sessions of physical therapy per week. (Tr. at 610-11; Turning Five Report at 1).

In late May 2007, the CSE notified L.S., the child's mother, that a meeting would be held on June 4, 2007 to develop an IEP for D.S. for the 2007-2008 school year, when he would be entering kindergarten. (Pl. Facts, ¶ 5; Defendant's Response to Plaintiffs' Local Rule 56.1 Statement of Facts ("Def. Response to Pl. Facts"), ¶ 5; Tr. at 612). L.S. testified that upon learning of the meeting, she called Dr. Diana Bowser a school psychologist serving as the district representative, to let her know of additional private evaluations of D.S. that L.S. believed Dr. Bowser did not

---

[8] The IEP submitted for D.S. for the 2006-2007 school year recommends that he receive 30 hours of special education itinerant instruction in addition to five hours of indirect parent training. (New York City Board of Education Individualized Education Program dated June 15, 2006 ("6/15/06 IEP"), Pl. Exh. B, at 1). However, his mother testified that D.S. received 35 hours (Tr. at 611) and her statement was confirmed by the DOE's Turning Five Summary Report. (Turning Five Summary Report dated May 3, 2007 ("Turning Five Report"), Def. Exh. 13, at 1).

possess.  (Tr. at 34, 612; 6/4/07 IEP at 2).[9]  L.S. reported that Dr. Bowser told her that she should bring those evaluations to the meeting.  (Tr. at 612).

On June 4, 2007, the CSE team convened for 45 minutes to develop D.S.'s IEP.  (Pl. Facts, ¶ 6; Def. Response to Pl. Facts, ¶ 6).  The meeting was attended by a special education teacher; by L.S.; by Jill Weynert, D.S.'s Program Coordinator; and by Dr. Bowser.  (Tr. at 614; 6/4/07 IEP at 2; Def. Facts, ¶ 4).  A general education teacher participated in a portion of the meeting.  (Tr. at 614; Def. Facts, ¶ 4).  Marion Pearl, who works for the DOE, was also consulted by telephone about an evaluation she had conducted of D.S.  (Tr. at 615-16).  Ms. Pearl was the only DOE participant in the meeting who had personally evaluated D.S.  (Pl. Facts, ¶ 8; Def. Response to Pl. Facts, ¶ 8).  Although a parent is entitled to have a "parent member" -- a parent of a student residing in the school district or a neighboring school district -- attend CSE meetings, L.S. signed a form waiving the parent member's participation.  (Declination Letter dated June 4, 2007, Def. Exh. 19).

The IEP created by the CSE team described DS as

a non-verbal child who had not yet mastered a formal means of communication with which to communicate his wants and needs. [D.S.]'s extremely high rates of self-stimulatory behaviors and distractibility profoundly

---

[9]  Dr. Bowser is incorrectly referred to as Dr. Gallagher in portions of the transcript.

> interfere with his learning and ability to attend to
> people and things in his environment. [D.S.] requires
> high rates of structure, repetition, consistency and
> reinforcement to learn. . . . Currently [the child]
> relies on gestures to communicate but is easily
> frustrated as all of his needs are not being met. He has
> difficultly discriminating between objects and people.
> [D.S.] can follow simple one-step instructions paired
> with gestures and some body parts.  He is unable to
> identify common objects in his environment and familiar
> people.

(6/4/07 IEP at 5).    The IEP recommended instruction in a

specialized school in the DOE's District 75 with a 6 to 1 to 1

("6:1:1") ratio of students to teacher to paraprofessional.

(6/4/07 IEP at 31; Pl. Facts, ¶ 16;  Def. Facts, ¶ 5).   It also

recommended that D.S. be provided on a weekly basis with three 30-

minute individual sessions of counseling and five 30-minute

individual sessions each of occupational therapy, physical therapy,

and speech-language therapy.   (6/4/07 IEP at 32).   The detailed,

specific annual and short-term objectives established for D.S. were

almost entirely copied from those established in his previous IEPs,

dated June 15, 2006, and February 15, 2007.

    By letter dated June 14, 2007, the defendant issued a Final

Notice of Recommendation to the plaintiffs that identified Public

School 94 ("P.S. 94") as the school D.S. was to attend during the

2007-2008 school year. (Final Notice; Pl. Facts, ¶ 23; Def. Facts,

¶ 8).  On June 22, 2007, L.S. and the case planner for D.S. visited

P.S. 94 to determine its appropriateness for D.S.  (Tr. at 373-74,

627-28; Pl. Facts, ¶ 24; Def. Facts, ¶ 9).   She spent about two

hours observing a 6:1:1 class and spoke with two teachers as well as the school's principal. (Tr. at 628-29; Pl. Facts, ¶ 24).

On August 20, 2007, D.S.'s parents enrolled him in the Brooklyn Autism Center (the "BAC") instead of P.S. 94. (Pl. Facts, ¶ 34). On that same day, their attorney sent a letter to the CSE Chairperson informing him that the parents were placing D.S. at BAC and that they intended to seek funding for the placement. (Letter of Gregory Cangiano dated Aug. 20, 2007 ("Cangiano Letter"), Pl. Exh. A; Def. Facts, ¶ 10). They also noted their rejection of the IEP developed for D.S., contending that it denied D.S. a FAPE for both procedural and substantive reasons. (Cangiano Letter). The cost of D.S.'s attendance at BAC for the 2007-2008 school year was $80,000, which his parents have paid. (Pl. Facts, ¶ 34). While attending BAC, D.S. also received, through the DOE, the related services of speech, occupational, and physical therapy in the amounts provided for in the 6/4/07 IEP. (Tr. at 651-53; 6/4/07 IEP).

On January 9, 2009, a CSE team met to consider its recommendations for D.S. during the 2008-2009 academic year. (Pl. Facts, ¶ 54; Def. Response to Pl. Facts, ¶ 54). The CSE concluded that a class in one of the DOE's specialized schools -- which includes a 6:1:1 class -- was inappropriate for D.S. and recommended that his case be deferred to the Central Based Support Team for possible placement in a private school. (Pl. Facts, ¶ 54;

Def. Response to Pl. Facts, ¶ 54; Memorandum of Law in Support of
Plaintiffs' Motion for Summary Judgment ("Pl. Memo.") at 15).

    B.    <u>Procedural History</u>

        1.    <u>The Administrative Hearing</u>[10]

On December 28, 2007, M.S. and L.S. requested a due process
hearing. (Letter of Jesse Cole Foley dated Dec. 28, 2007 ("Foley
Letter"), Def. Exh. 1, at 1). They contended that the team that
developed the IEP had been inappropriately constituted because no
parent member was present and a general education teacher was only
present for five to ten minutes. (Foley Letter at 2). The parents
also argued that most of the pages of the new IEP had been recycled
from the previous year's IEP and thus did not accurately reflect
D.S.'s current levels of functioning and made it impossible to
measure D.S.'s improvement. (Foley Letter at 2). In addition,
they challenged the reduction in D.S.'s related services from hour-
long to 30-minute sessions, claiming that the reduction was
baseless and did not account for D.S.'s individualized needs.
(Foley Letter at 2). Finally, the plaintiffs noted that L.S. had
visited P.S. 94, the recommended placement for her son, and found
that it failed to offer D.S. "a suitable functional grouping for

---

[10] My summary of both the documentary and testimonial evidence
presented at the hearing is by no means complete. I focused on
what I deemed relevant to the issues before me. Most obviously, I
omitted all information relating to the adequacy of BAC as a
private placement for D.S. because that issue was not reached by
the administrative officers and is, for the same reasons, not
addressed by me.

academic, social, and emotional purposes" and employed staff who were not sufficiently trained and knowledgeable to address D.S.'s needs. (Foley Letter at 2-3). The parents sought reimbursement of the tuition they had paid to BAC. (Pl. Facts, ¶ 34, 48). Lorraine Gross, an IHO, conducted a hearing to determine the validity of the parents' claims. The hearing lasted six days between April 9, 2008 and October 8, 2008. (Pl. Facts, ¶ 49; Def. Facts, ¶ 13).

    a.    The Exhibits

    At the hearing, the DOE submitted as exhibits evaluations of D.S. prepared from November 2006 through January 2007, which had been part of the record before the CSE. These evaluations were conducted by Dr. Marilyn C. Agin, a developmental pediatrician and physiatrist, and Kelly Dwyer, a speech-language pathologist (11/1/06 Evaluation at 1, 4); another speech-language pathologist, Lavinia Pereira (12/9/06 Evaluation at 2); Lisa D'Arpino, an occupational therapist (Occupational Therapy Progress Report dated Jan. 2, 2007, Def. Exh. 11, at 2); Ms. Weynert, D.S.'s program coordinator (Educational Progress Report dated Dec. 6, 2006, Def. Exh. 12, at 1, 4); and Justine A. Williams, a certified school psychologist, and Dr. Cecelia McCarton, a professor of clinical pediatrics at Albert Einstein College of Medicine. (Neurodevelopmental Evaluation dated Dec. 20, 2006 and Jan. 9,

2007,[11] Def. Exh. 14, at 1, 9).  The reports unanimously recommended that D.S. continue to receive the services that were being provided to him at the time: at least 35 hours of 1:1 ABA therapy as well as 60-minute sessions of speech and occupational therapy five times a week.[12]  The reports also portrayed D.S. as severely delayed and easily distracted.  As an example, Dr. Agin and Ms. Dwyer observed,

> Although [D.S.] still displays self-directed behaviors, he was more attentive and related today, and sought out social engagement more frequently than during the initial evaluation.  His eye contact, however, continues to be fleeting, and his response to his name is inconsistent (though reportedly better during ABA).  When the structure of sitting at the table was removed, and [the child] was left on his own, he wandered around the room, touching various objects or toys (without attempting to explore them), engaged in self-stimulatory behaviors (e.g., jumping in circles), or sought out increased sensory input by pushing his body against sofa cushions. His mother reported that finding activities that interest [D.S.] for more than a few moments is quite challenging; he performs best when given a specific amount of structure.

(11/1/06 Evaluation at 3).

A Turning Five Summary Report prepared for the DOE by Ms. Pearl was also submitted.  Ms. Pearl observed D.S. on May 3, 2007 while he received his ABA lesson at home.  (Turning Five Report at 1).  She also administered the Developmental Assessment of Young

---

[11] The report is dated January 9, 2006, but it is clear that this was a typographical error.  (Tr. at 9-10).

[12] A report by Purva Patel, a physical therapist, also recommended that D.S. continue to receive physical therapy during the summer months of 2007 and the following school year.  (Related Service Student Progress Report dated Jan. 4, 2007, Def. Exh. 10).

Children test to D.S. to assess his development in the domains of cognition, communication, and social-emotional, physical, and adaptive behaviors. (Turning Five Report at 2). Ms. Pearl concluded that D.S. was "making progress with the services he's been receiving." (Turning Five Report at 2). She also found that he was functioning at a "very poor level on all domains," except for physical development where his functioning was deemed "poor." (Turning Five Report at 2). Ms. Pearl recommended that D.S. continue with an ABA program and related services. (Turning Five Report at 2).

b.    The District's Witnesses

Dr. Bowser was the district's first witness at the hearing. (Tr. at 11-12, 31-32). She testified that she remained confident that the IEP's recommendations were suitable. (Tr. at 46). She explained that the 6:1:1 classroom provided careful supervision that D.S. required due to his tendency to climb to high places, dart away from adults, and put objects into his mouth. (Tr. at 51). By attending a kindergarten class, Dr. Bowser noted, D.S. would "learn what children that age are supposed to do." She stated, "He has to be with other kids. . . . We wanted him to be with other kids and to experience what other kids were experiencing." (Tr. at 157).

When asked about the amounts of related services that were recommended for D.S. -- which had been reduced from the previous

year's IEP, Dr. Bowser stated that they were appropriate because the CSE "wanted him to be in the classroom setting as much as possible" and wanted to create opportunities for the service providers to interact with the classroom teachers and, if possible, deliver some of the services in the classroom.  (Tr. at 53-55). She also explained that she expected the classroom teachers to help D.S. with his expressive and receptive language skills and the skills he would acquire from counseling, although she noted that they were not specially trained in those skills.  (Tr. at 95-96). In response to questions about the DOE's recommendations, Dr. Bowser denied that the DOE had reduced the recommended length of related services in order to comply with the manner in which the DOE routinely provides services to school-aged children.  (Tr. at 120).  She maintained that the IEP was developed specifically with D.S. in mind.  (Tr. at 47-48, 120).

Regarding the goals established for D.S. in the IEP, Dr. Bowser admitted that "some of" them were photocopied from the IEP for the 2006-2007 school year, but added that each goal had been discussed at the meeting and the ones that were kept were those that D.S. had not yet achieved.  (Tr. at 56).  She stated that both L.S. and Ms. Weynert had reviewed the goals and had not asserted at the CSE meeting that they were inappropriate for the child.  (Tr. at 56-58).

During cross examination, Dr. Bowser admitted that she had

14

never met D.S. nor observed him in an educational setting. (Tr. at 72). She explained that her disagreement with Dr. McCarton, the pediatrician who had evaluated D.S., over the appropriate program for the child stemmed from her training as a teacher and psychologist as opposed to Dr. McCarton's training as a medical doctor. (Tr. at 93-94). Thus, Dr. Bowser testified that she, unlike Dr. McCarton, was "looking for a school program" that would allow D.S. to "learn to interact appropriately with peers and adults" and "increase his cognitive functioning." (Tr. at 94).

When asked about the recommendations that D.S. continue to receive 1:1 ABA therapy, Dr. Bowser stated that ABA "seems to be the preferred therapy, but I also know that there's other therapies that are used with autistic kids such as [Training and Education of Autistic and Related Communication Handicapped Children ("TEACCH")]."[13] (Tr. at 95). She further explained that she does not believe that one any technique is best for addressing the needs of autistic children. (Tr. at 140). However, Dr. Bowser admitted

_____

[13] TEACCH uses "a highly structured environment which may include physical organization of furniture, clearly delineated activity areas, picture-based schedules and work systems, and instructional clarity. The child is guided through a clear sequence of activities and thus aided to become more organized[.]" Autism Speaks, Treatments for Autism, http://www.autismspeaks.org/whattodo/index.php#teacch (last visited March 3, 2010). ("TEACCH Treatment") (Tr. at 194-95, 391). According to the group Autism Speaks, "Though TEACCH does not specifically focus on social and communication skills as fully as other therapies it can be used along with such therapies to make them more effective." Autism Speaks, TEACCH Treatment.

that the 6:1:1 classroom is the only program that the defendant offers to such children.  (Tr. at 127).

Alex Campbell, a special education teacher who would have been D.S.'s teacher at P.S. 94, was the district's next witness.  She testified that all of the students in her 6:1:1 classroom are autistic, ranging in age from five to six, and that the ratio of students to adults benefits such students because it "allow[s] them more opportunities to work with the teacher on [sic] a one-to-one or a small group setting."  (Tr. at 172, 175).  Ms. Campbell stated that she believed that group settings are important for autistic children in order to allow the children an opportunity to learn from "peer modeling."  (Tr. at 173).  The witness emphasized the importance of teaching students socialization skills, stating that such skills allow them to "learn[] that they are individuals" and teach them that "they need to interact with others."  (Tr. at 191, 203).

Ms. Campbell described a typical day in her classroom, which included morning meeting in which the children greeted each other, English Language Arts in which the children worked in smaller groups on their writing and reading skills, the opportunity for the children to spend time in a "sensory room" doing "fine motor activities," free play in which the children played together or independently, a math session, recess in which they played with students from another class, a lesson in science or social studies,

16

and group lessons that included special activities such as playing Bingo, learning a dance, or working on a computer. (Tr. at 186-90).

Ms. Campbell testified that she is familiar with ABA and that it is used in her classroom "on an as-needed per child basis." (Tr. at 192). She also explained that she uses other therapies with her students, including TEACCH and the Picture Exchange Communication System ("PECS").[14] (Tr. at 194-96). Ms. Campbell maintained that using different methodologies with a child is generally beneficial but that she will use only a single methodology with some students. (Tr. at 199-201).

Additionally, Ms. Campbell testified about the progress that her students made during the 2007-2008 school year. She asserted that initially the class was "very disorganized" as the students lacked "play skills" and were not used to being in a structured environment. (Tr. at 178). She also noted that two of her students were non-verbal and "had very poor communication methods" and that all of them "had issues with tantruming." (Tr. at 178). Ms. Campbell further explained that the students had functioned below age level academically and were unable to concentrate during

---

[14] "PECS" is "a type of augmentative and alternative communication technique where individuals with little or no verbal ability learn to communicate using picture cards. Children use these pictures to 'vocalize' a desire, observation, or feeling." Autism Speaks, Treatments for Autism, http://www.autismspeaks.org/whattodo/index.php#pecs (last visited March 3, 2010). (Tr. at 630, 718-19).

academic lessons in the beginning of the year.  (Tr. at 179-81).
She testified that all of those students were now verbal; they
could label things and notice changes in their environment; they
could read simple storybooks; they could sit still for fifteen to
twenty minutes; they could transition independently between
activities; they were more alert; and they played with each other.
(Tr. at 181-83).

Ms. Campbell stated that she was familiar with D.S. from
reviewing his IEP.  (Tr. at 205).  She asserted that D.S.'s IEP
would have provided him with a meaningful educational benefit and
was appropriate for his deficits.  (Tr. at 205-06, 217).  She went
into great detail explaining how the goals set forth in his IEP
could have been addressed in her classroom.  (Tr. at 206-17).

On cross examination, plaintiffs' counsel asked Ms. Campbell
about how much ABA is provided to students in her classroom.  She
responded that ABA takes place when the children are in a small
group or one-on-one and it lasts for 10 to 30 minutes at a time,
depending on the child's attention span.  (Tr. at 230-31).  She
further stated that throughout an entire day, a child could receive
a maximum of one hour and a half of one-on-one ABA therapy.  (Tr.
at 231-32).  However, she later clarified that that amount was "not
the most that can be provided" but "the most that has been
provided."  (Tr. at 258).  Ms. Campbell also agreed with
plaintiffs' counsel that a 6:1:1 classroom is not appropriate for

all children with autism.  (Tr. at 235).  In addition, she stated
that she believed D.S. required "one-to-one attention throughout
the day according to his significant delays . . . ."  (Tr. at 272).
However, Ms. Campbell later explained that she believed D.S. would
receive this attention in her 6:1:1 classroom by being provided
"more direct attention" during "certain activities."  (Tr. at 300).
She also stated that she had never worked with a child who had not
benefitted from being in a 6:1:1 classroom.  (Tr. at 315).

The district next called Susan Cruz, the Assistant Principal
of P.S. 94, who testified about the procedures and training at the
school.  She explained that the school works to transition children
like D.S. who had worked with ABA therapy to be able to adapt to
the more varied methodologies employed at P.S. 94.  (Tr. at 331-
32).  She also stated that the 6:1:1 classroom placement would be
appropriate for D.S., as she had seen it work with children who had
similar IEPs.  (Tr. at 332-33).  On cross examination, Ms. Cruz
stated that she had never met, observed, or evaluated D.S and
agreed with plaintiffs' counsel that not all methodologies of
teaching children with autism are appropriate for all autistic
children.  (Tr. at 511-13).

c.   The Parents' Witnesses

The plaintiffs' first witness was Ms. Weynert, who served as
D.S.'s program coordinator during the 2005-2006 and 2006-2007
academic years.  (Tr. at 348-49).  She stated that D.S. received 30

to 35 hours per week of 1:1 ABA therapy during those years.  (Tr. at 350).  She explained that she chose to use ABA to work with D.S. because "he requires the most intensive amount of repetition and reinforcement . . . and structure that a child could need."  (Tr. at 352).  Ms. Weynert noted that the predominant goal of D.S.'s program was "behavior reduction" in order to improve his communication skills and "his ability to even to be able to occupy some amount of time independently without engaging [in] inappropriate behaviors."  (Tr. at 351).  She testified that D.S. progressed very slowly because "he was one of the toughest kids –– he had the toughest time learning." (Tr. at 353).  She maintained that "he required the most incredible amount of consistency and prompt levels to learn a task."  (Tr. at 354).  Ms. Weynert also detailed the difficulties D.S. experienced in learning how to communicate and the incremental progress he ultimately achieved using a DynaVox[15] communication device after futile attempts at using PECS.  (Tr. at 355-58).

Ms. Weynert described D.S.'s condition in June of 2007, at the time his IEP was formulated.  She stated that his communication skills were "limited" and that he required "someone with him at all times."  (Tr. at 357-58).  She explained that when left alone, D.S. engaged in "highly verbal and stereotypic behaviors," which means

---

[15] A DynaVox is "an assistive technology speech device." Stanley C. v. M.S.D. of Southwest County Schools, 628 F. Supp. 2d 902, 957 (N.D. Ind. 2008).

that he would jump, flap, pick up an object and repeatedly tap it against other objects, knock objects over, and climb up on things that were high and then "teeter off of the edge -- so [that] he would get . . . the sensation of falling." (Tr. at 359).

Ms. Weynert testified about attending the June 4, 2007 CSE meeting. She related that she had described D.S.'s history and then had stated that D.S. required 1:1 ABA therapy provided by someone who was well-trained in the methodology. (Tr. at 360). Ms. Weynert asserted that the meeting was not collaborative and that the CSE members "were recommending what they could recommend and then nothing that we said would make any . . . any kind of difference." (Tr. at 360-61, 365).

Ms. Weynert maintained that the goals set forth in D.S.'s IEP could not be achieved in a 6:1:1 classroom, stating:

> [D.S.] had a hard enough time learning with one to one.
> In a group situation . . . [he] literally would not be
> able to learn. He wouldn't even be able to attend. . . .
> [H]e wouldn't be able to sit. He wouldn't be able to
> acquire any skills I think even to say he would co-exist
> well in this classroom [] would be unrealistic. . . .
> [H]e requires just unbelievable amounts of attention and
> repetition and consistency.

(Tr. at 362-63, 367). Ms. Weynert insisted that D.S. would not be able to learn from other children in a classroom and noted that D.S. was once taken to a class and "the visual and auditory stimuli in that class was so overwhelming, just even getting him to remain seated, getting him to even respond and look -- gaze at another

child [] -- was extremely difficult." (Tr. at 363-64). Ms. Weynert further testified that D.S. was incapable of appropriately interacting with his peers. (Tr. at 366-68).

When asked about the IEP's recommendation that D.S.'s related services be reduced, Ms. Weynert noted that she had "strongly advised against" making such a change. (Tr. at 373). She explained that it could take as much as a half an hour to engage with D.S. before even beginning the therapy session and that sessions lasting only 30 minutes were thus unlikely to provide learning. (Tr. at 373). She disagreed with any assertion that D.S. would require shorter amounts of related services once he had entered a school environment. (Tr. at 402-03).

Ms. Weynert testified about visiting P.S. 94 with L.S. during the end of the 2006-2007 school year. (Tr. at 373-74). She called the teacher's level of training and knowledge of ABA "minimal" and criticized the way she ran the classroom. (Tr. at 375-78). Ms. Weynert testified that the children "were all over the place." (Tr. at 377). She noted, "Not one person was orienting to the speaker or the teacher. [The teacher] didn't really do anything to engage them, was kind of just talking and it was -- it wasn't productive really in any way." (Tr. at 377-78). Ms. Weynert specifically described seeing a non-verbal child who was engaging in "attention seeking behaviors and was getting scolded and reprimanded each time by the assistant teacher." (Tr. at 376).

She said that she was told that that child used a PECS system to communicate, but that the picture book he used stayed in his desk and was to be taken out only during lunch. (Tr. at 376). She claimed that the classroom "[a]bsolutely would not have been appropriate for [D.S.]. . . . He would absolutely need one to one. He would not learn in that environment." (Tr. at 378). Ms. Weynert further claimed that the "eclectic approach" to dealing with autistic children employed at P.S. 94 had been proven ineffective by research, particularly for a child like D.S. (Tr. at 383-84). She contended that "ABA has consistently proven to be effective in the research." (Tr. at 422).

On cross examination, Ms. Weynert maintained that she believed 1:1 ABA is the best method for treating children with autism and that she had communicated her belief to the parents with whom she she works, including D.S.'s parents. (Tr. at 385-88). However, Ms. Weynert noted that it was the doctors for D.S. who initially recommended 1:1 ABA and who referred the parents to her. (Tr. at 386). Ms. Weynert conceded that her knowledge of other programs for treating autism was more limited. (Tr. at 389-91, 394-97).

The plaintiffs then called Jaime Nicklas, the Educational Director of BAC. (Tr. at 444). Ms. Nicklas described ABA as "the only empirically proven method to teach children diagnosed with autism." (Tr. at 445-48). In response to questioning by defense counsel about the scientific community's criticism of ABA, she

23

stated that she did not know of any scientific research that rejected ABA and that the research on which ABA is based had "recently been replicated." (Tr. at 553). She conceded that "[t]here's been some anecdotal writings that have gone back and forth" on the technique, but stated that these articles were based on opinions, not research. (Tr. at 553). Ms. Nicklas agreed that other methodologies, such as TEACCH, could be used to treat children with autism, but explained that it depended on where the child fell on the autism spectrum and that she had never seen TEACCH work "well." (Tr. at 448, 556-57). On redirect, she clarified that she thought that "some kids on [the] very high end of the spectrum . . . may be okay in other placements, but I still very strongly feel that ABA is the best in my personal opinion. It's empirically proven to treat kids -- and I think the fact that there's research on it is crucial." (Tr. at 581).

Ms. Nicklas stated that D.S. is "severely affected by autism and needs . . . intensive one on one services." (Tr. at 451). She testified that when she met D.S. in July 2007, he was "non-verbal" and, when left alone, engaged in self-stimulatory behaviors, including tapping objects and making vocalizations. (Tr. at 450). She explained that if not addressed, self-stimulatory behavior can become injurious as the child's strength increases. (Tr. at 458-59).

Ms. Nicklas testified that a teacher could not work with D.S.

and another student simultaneously because D.S. is "easily distracted" by other children in a room and because he cannot follow directions unless attention is focused directly on him. (Tr. at 489-90). She further stated that she did not believe D.S. could learn in a 6:1:1 classroom and that interaction with other children would not benefit, and would likely harm, his development. (Tr. at 490-93). Ms. Nicklas testified that D.S. was incapable of engaging in five to ten minutes of play without an adult because, if left alone, he would engage in self-stimulatory behavior. (Tr. at 493-94). In fact, she further explained that D.S. could never be left alone because "he would probably start running around the room and -- and begin tapping and vocalizing a lot, and that he could not function in a 6:1:1 class because he would be "stimming [engaging in self-stimulatory behavior] at a very, very high rate in the classroom." (Tr. at 497-98).

L.S. testified next. She first provided a summary of D.S.'s developmental delays, diagnoses, and treatment before the creation of the IEP at issue. (Tr. at 607-11). She described in great detail the difficulty with which D.S. learns. (Tr. at 638-41). She explained, for instance, that her son "requires the most incredible amount of prompting" before he slowly masters a skill; but even after "he masters something with one person, he then needs to be taught it with another person. He does not have the ability to generalize his skills across people and across environments."

25

(Tr. at 640).

L.S. also testified about the June 4, 2007 CSE meeting. She explained that after receiving notice that a meeting would be held, she called Dr. Bowser to schedule a date. (Tr. at 611-12). L.S. said that they chose a date that was only a few days away because Dr. Bowser "was under [] tremendous time pressure to get all of the meetings done by a certain date." (Tr. at 612). L.S. testified that even though she provided Dr. Bowser with recent evaluations of D.S., the CSE team spent no time reviewing them. (Tr. at 612-13).

L.S. further stated that when she arrived at the meeting, Dr. Bowser informed her that the parent member who was scheduled to attend was unavailable and asked L.S. to waive the participation of a parent member. (Tr. at 613). She said that Dr. Bowser told her that if she did not do so, the meeting would need to be rescheduled, which made Dr. Bowser "quite stressed" because she needed to send out school placement letters on time. (Tr. at 614, 668). L.S. testified that she felt "pressured to have the meeting" and that she "didn't really feel like [she] had a choice" not to waive the parent member's attendance. (Tr. at 614). L.S. noted that when the idea of recommending D.S. for placement in a 6:1:1 classroom came up, she and Ms. Weynert expressed their serious concerns about such a placement. (Tr. at 616-18, 622-23). L.S. testified that Dr. Bowser responded that "all that she could recommend was a 6:1:1 placement, that was all that was available."

(Tr. at 617).  In addition, L.S. stated that she was "extremely concerned" that the amount of time recommended for D.S.'s related services was being reduced by half.  (Tr. at 619).

L.S. testified that after she received a Final Notice of Recommendation on June 22, 2007 mandating that D.S. attend P.S. 94, she and Ms. Weynert went to observe the school.  (Tr. at 627-28). L.S. found that the school was inadequate for her son and that the staff were not "adequately trained to teach a non-verbal child such as [D.S.]."  (Tr. at 630-31).  She asserted that after observing that a non-verbal boy had been separated from his PECS book and thus "had no way to tell anybody anything he wanted," she felt that the staff were not adequately trained to teach her non-verbal child.  (Tr. at 630-31).  L.S. also noted that despite the teachers' assurances that the children, like D.S., who wore diapers were taken to the toilet every 30 minutes, she noticed that none of them were given the opportunity to use the bathroom during the two hours in which she observed the class.  (Tr. at 631-32).  She also reported that the children engaged in "aggressive behavior" and "a lot of self-stimulatory behaviors that were not [] being managed." (Tr. at 633-34).  L.S. testified that her conversations with the school staff about their use of ABA made her nervous because their ABA methods did not involve incremental extreme repetition and reinforcement and were not individually tailored to the child. (Tr. at 636-37).  She concluded that the program at P.S. 94 was not

27

one in which D.S. would be able to learn. (Tr. at 629). She explained that D.S. "needs structure and consistent repetition and I didn't think that was available given [] the sheer nature of the number of children and the number of adults in the room." (Tr. at 629-30).

During cross examination, L.S. agreed that D.S.'s progress when treated with 1:1 ABA therapy had been "very slow." (Tr. at 678-79). She also conceded that it was not Ms. Campbell's class that she had observed at P.S. 94. (Tr. at 678). She later clarified that she had observed the class she had been directed to visit and "didn't know Ms. Campbell existed." (Tr. at 681-82).

Dr. McCarton, a pediatrician who had treated D.S. and who runs a school for autistic children, was the final witness at the hearing. (Tr. at 686, 689). She testified about her evaluations of D.S. in December of 2006 and January of 2007. (Tr. at 689). Dr. McCarton stated that at that time, D.S. still had extremely limited functioning, as he remained essentially non-verbal, was not responsive to strangers, did not orient to anyone who was speaking to him, was extremely "distractible," and had very limited play skills. (Tr. at 690-92). She noted that as a result, she recommended that D.S. receive "very intensive" ABA therapy for 35 or 40 hours a week as well as multiple therapeutic services. (Tr. at 692). Dr. McCarton explained that because of how easily D.S. could be distracted, she "couldn't imagine him really being in a

classroom situation where there would be multiple people present." (Tr. at 693).

When asked about the other methodologies used to educate children with autism, Dr. McCarton explained that determining which one was appropriate depended on the child's level of functioning. (Tr. at 693-94). Although she said she had recommended other methodoligies for other children, she maintained that only 1:1 ABA was appropriate for D.S. because "he needed a very, very intensive model." (Tr. at 694). She also asserted that an hour and a half of ABA therapy per day –- the maximum amount that Ms. Campbell said had been used in her classroom –- is insufficient for D.S. (Tr. at 697-99). Dr. McCarton contended that she "couldn't understand how [D.S.] could possibly learn in [a group setting] since in a one on one setting we were having a difficult time engaging him." (Tr. at 697). She testified that D.S. did not have the capacity to observe, engage with, or play with other children, much less learn from them. (Tr. at 696-97).

On cross examination, Dr. McCarton admitted that she had never observed D.S. in a classroom setting and had never been a classroom teacher. (Tr. at 703). In addition, she agreed that D.S. had progressed very slowly while receiving 1:1 ABA therapy. (Tr. at 714).

    2.   The IHO's Decision

In an 18-page decision, the IHO found that the DOE had offered

D.S. a FAPE and that the parents therefore were not entitled to reimbursement of their tuition payment. (Hearing Officer's Findings of Fact and Decision dated Oct. 22, 2008 ("IHO Decision") at 4-5). Because the IHO determined that the program offered to D.S. was appropriate, she did not address whether BAC was a proper placement for D.S. (IHO Decision at 18).

The IHO first discussed the plaintiffs' challenges to the procedures used by the CSE. Although noting that "[i]t is unfortunate that the Department encourages parents to waive the participation of a parent member," she found that the lack of a parent member at the CSE did not deny D.S. a FAPE "as the parent still participated in the development of the IEP and had participated in the development of prior IEPs developed by [CPSE]." (IHO Decision at 6-7). The IHO also rejected the parents' claim that the limited participation of a general education teacher in the CSE led to denial of a FAPE, reasoning that these teachers are only required to be part of an IEP team "if the child is, or may be" enrolled in a general education program, and D.S. had never seriously been considered for one. (IHO Decision at 7). She also dismissed the plaintiffs' contention that the DOE did not take into account the parents' concerns at the IEP meeting. (IHO Decision at 7-8). She further found that the fact that parts of the IEP had been copied from the previous IEP that was developed by the CPSE was "insignificant" because "[t]he record is replete with testimony

as to [D.S.]'s very slow learning style, and therefore past information was still accurate." (IHO Decision at 8).

The IHO next turned to the substantive issues raised by the plaintiffs. She first described the evidence presented at the hearing by the defendant. (IHO Decision at 8-16). She noted that while at BAC during the 2007-2008 school year, D.S. had received related services through the DOE in the amounts recommended by the 6/4/07 IEP. (IHO Decision at 16). She further noted that L.S. had testified that her son had benefitted from these services. (IHO Decision at 16). Based on this information, the IHO found that the plaintiffs were precluded from challenging the 6/4/07 IEP's reduction in these services from 60 to 30 minutes per session. (IHO Decision at 16).

The IHO then briefly summarized the plaintiffs' case and the testimony of most of their witnesses. (IHO Decision at 16-17). She determined that "although 1:1 ABA was recommended for [D.S.,] the people who recommended it believed that it was the only methodology that worked and were not open to other approaches." (IHO Decision at 17). Additionally, she noted that as long as it provides for specialized instruction in a child's areas of need, an IEP is not required to specify or provide one type of methodology for a student. (IHO Decision at 17). She also deemed the parents' concerns about the IEP "speculative," explaining that just because D.S. had only ever received 1:1 ABA instruction did not mean that

31

other methodologies would not work for him. (IHO Decision at 17).
Finally, she dismissed the plaintiffs' assertion that P.S. 94 was
an inappropriate placement for D.S., finding this claim unsupported
by the record. (IHO Decision at 18).

### 2.    The SRO's Decision

The parents appealed the IHO's determination to the New York
State Education Department's Office of State Review. (Def. Facts,
¶ 17). The SRO upheld the IHO's decision. He found that the IHO
correctly determined that D.S. was offered a FAPE for the 2007-2008
school year. (SRO Decision at 8). Like the hearing officer,
because he found that the DOE had met its burden, the SRO did not
consider whether BAC was an appropriate placement. (SRO Decision
at 8).

The plaintiffs then brought the instant action.

## Discussion

### A.    Summary Judgment in IDEA Cases

The vast majority of appeals from administrative decisions
brought pursuant to the IDEA are decided on motions for summary
judgment. A.G. ex rel. N.G. v. Frieden, No. 08 Civ. 1576, 2009 WL
806832, at *6 (S.D.N.Y. March 26, 2009); Werner ex rel. Werner v.
Clarkstown Central School District, 363 F. Supp. 2d 656, 658
(S.D.N.Y. 2005). In deciding such a motion, a district court does
not engage in the traditional inquiry to determine whether there
are disputed issues of material fact. A.C. ex rel. M.C. v. Board

of Education of the Chappaqua Central School District, 553 F.3d
165, 171 (2d Cir. 2009) ("Summary judgment in this context involves
more than looking into disputed issues of fact; rather, it is a
pragmatic procedural mechanism for reviewing administrative
decisions.") (internal quotation marks omitted); A.G., 2009 WL
806832, at *6; Student X, 2008 WL 4890440, at *3 ("An IDEIA action
. . . differs from an ordinary summary judgment in that the
existence of a disputed issue of fact will not defeat the
motion."). Instead, the court reviews the administrative record,
as well as any additional evidence submitted by the parties, to
determine if a preponderance of the evidence indicates that the
IDEA has been followed. Sherman ex rel. Nishanian v. Mamaroneck
Union Free School District, 340 F.3d 87, 93 (2d Cir. 2003); M.S. ex
rel. S.S. v. Board of Education of the City School District of the
City of Yonkers, 231 F.3d 96, 102 (2d Cir. 2000); Werner, 363 F.
Supp. 2d at 658, 658 n.1. "The court's inquiry is a results-based
standard in many respects, concerned more with a just outcome for
a disabled student than with judicial efficiency." T.Y., 584 F.3d
at 418.

B.    Deference to the Administrative Decisionmakers

"'[T]he role of the federal courts in reviewing state
educational decisions under the IDEA is circumscribed.'" Id. at
417 (quoting Gagliardo v. Arlington Central School District, 489
F.3d 105, 112 (2d Cir. 2007)). Although federal courts should not

33

"'simply rubber stamp administrative decisions,'" they should give "'due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" M.S., 231 F.3d at 102 (quoting Walczak, 142 F.3d at 129); accord Board of Education of the City School District of the City of New York v. R.R. ex rel. T.R., No. 03 Civ. 390, 2006 WL 1441375, at *7 (S.D.N.Y. May 24, 2006) ("Disturbing the IHO's findings would be especially improper under the standard by which federal courts are to review administrative decisions under the IDEA."). Courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206 (1982). In fact, the Supreme Court and the Second Circuit "have interpreted the IDEA as strictly limiting judicial review of state administrative decisions." Grim v. Rhinebeck Central School District, 346 F.3d 377, 380-81 (2d Cir. 2003) ("Grim II").

The outcome of this case hinges upon the degree of deference that must be afforded the determinations of the SRO and IHO. Seemingly with that notion in mind, the plaintiffs attempt to distinguish this case from Grim II. (Pl. Memo. at 3-5). In Grim II, the Second Circuit reversed a district court's decision to award tuition reimbursement, based in large part on the district court's failure to defer to the administrative officers' conclusion

34

that such an award was inappropriate.  346 F.3d at 383.  The plaintiffs argue that deference is not required in this case because, unlike Grim II, it presents "no conflicting opinions," "no review of which methods are effective," and "no controversial issue of educational policy."  (Pl. Memo. at 4).  Rather, the parents insist, "[t]he issue here is whether the SRO erred in finding that the proposed IEP was developed in accordance with procedural mandate and whether it was likely to enable D.S. to progress in areas of documented delay."  (Pl. Memo. at 4-5).

The plaintiffs, however, read both Grim II and the record in this case too narrowly.  First, it is clear from Grim II itself that its principle of deference applies beyond instances in which the court must decide a controversial issue of educational policy.  In Grim II, the court also overturned the district court's reversal of the administrative officers' determination that the IEPs were procedurally sound.  345 F.3d at 381-82.  The district court had found the IEPs procedurally invalid due to the "extensive delay" in the school district's review of the challenged IEPs as well as the IEPs' "formulaic articulation of goals and strategies for evaluating [the student's] progress."  Id. at 381.  Although the Court of Appeals acknowledged that a delay that denies the student a meaningful education may violate the IDEA, it did not find that to be the case in Grim II.  Id. at 381-82.  The Circuit further concluded:

35

> [H]aving reversed the District Court's holding on the
> legal effect of delay, it is sufficient for our purposes
> to note that -- whether a procedural or a substantive
> issue -- the sufficiency of goals and strategies in an
> IEP is precisely the type of issue upon which the IDEA
> requires deference to the expertise of administrative
> officers.

Id. at 382.  Therefore, Grim II appears to mandate deference to

administrative decisions on most issues relating to educational

policy, whether or not they are controversial.

Second, the parents incorrectly suggest that there are no

conflicting opinions about educational policy at issue in this

case.  As the parties' briefs demonstrate, this case involves a

heated debate over the educational needs of a severely autistic

child.  The plaintiffs assert that D.S. requires 1:1 ABA therapy

and cannot benefit from an environment in which he is provided

other therapies and exposed to other students.  The defendant,

conversely, argues that D.S. may benefit from methods other than

ABA and that exposure to his peers -- in a 6:1:1 classroom -- would

benefit his socialization, as well as other skills.

A court could well play a role in adjudicating such a

disagreement.  While there is no question that a court should

refrain from deciding how best to educate a child, it should be

equally clear that a court would be adept at determining if someone

with such expertise properly made such a determination.  A federal

court is quite competent to examine  whether a hearing officer

correctly weighed the evidence.

Nevertheless, this Circuit leaves little room to analyze substantive deficiencies in the evidence presented by the DOE at the hearing.  See T.P. ex rel. S.P. v. Mamaroneck Union Free School District, 554 F.3d 247, 252, 254 (2d Cir. 2009) (reversing finding of district court holding that IEP was substantively flawed). Instead, case law appears to indicate that as long at the DOE is able to produce an expert to support its position at a hearing and receives a positive determination by at least one of the administrative officers, the DOE's position is nearly assured victory in the federal courts.  See M.H. ex rel. A.H. v. Monroe-Woodbury Central School District, 250 Fed. Appx. 428, 429-30 (2d Cir. 2007) (reversing district court's grant of tuition reimbursement to parents); A.C., 553 F.3d at 168 (same).

This state of affairs is most clearly illustrated by the course of the litigation in Grim II.  Before the district court were IEPs for three different school years for a child with dyslexia.  Grim v. Rheinbeck Central School District, No. 98 Civ. 4854, 2002 U.S. Dist. LEXIS 26915, at *2, *5 (S.D.N.Y. March 29, 2002) ("Grim I").  In an extremely detailed decision, the district court concluded that the IDEA's procedural mandates were violated during the creation of all three IEPs and that the violations were serious enough to deprive the child of a FAPE. Id. at *146-47.  It also found that the last two of the three IEPs were flawed substantively and thus denied the child the educational benefit to

which she was entitled.  Id. at *147.  Consequently, the court awarded the child's parents tuition reimbursement for the private school in which they had placed her after rejecting her IEPs.  Id. at *147.

The debate in Grim I is not unlike the dispute involved here. The parties there disagreed over whether the child would benefit from placement in some general education classes while also receiving special attention.  Id. at *16, *19, *31-32, *48-52, *69, *73, *81.  Furthermore, there was dispute over whether the Orton-Gillingham method of teaching dyslexic children, or a similar approach, was required in order for the child to learn, or whether she would benefit from a more varied approach.  Id. at *81-88. ("[The expert] was not familiar with any other program [besides Orton-Gillingham] that could effectively teach dyslexic students like [C.G.]."). As in this case, there was a divide -- although not as stark -- over the effectiveness of the IEPs between those who had worked with the child, all of whom deemed the IEPs inadequate, and those who had not, who believed that the IEPs met the child's needs.  Id. at *131-33.

The district court found this distinction extremely significant, concluding that "[t]his is not a situation where equally placed experts are competing about methodology.  Rather, the parents' experts had a full understanding of [the child]'s educational challenges, and the District's experts had no such

understanding." Id. at *135.  It explained:

> To the degree that the District's experts testified
> somewhat contrary to my conclusion, that testimony is not
> supported by the evidence in this case.  More
> importantly, two of the experts offered by the District
> had neither met nor tested [the child], and had no
> personal information which would support their
> conclusions that an individualized education plan for
> [her] did not require the Orton-Gillingham method.

Id. at *131.  It also wrote, "It is important to note that [the

District's witness] had reviewed [the child]'s test results and

IEP, but she had not met or tested [the child]. . . .  To the

degree that . . . the District's last expert[] testified that

Orton-Gillingham was not the required, or even the best method for

educating a child with a reading disability, his testimony must be

balanced against his lack of knowledge about [the child]." Id. at

*132.  Finally, the district court determined:

> based on the record below, at which all of these
> witnesses testified repeatedly, and especially based on
> their testimony in federal court, that the three experts
> on dyslexia that were called by the parents were credible
> and persuasive.  Their testimony was grounded in
> experience, and in their own independent examinations and
> observations of [the child].

Id. at *134.

Because the district court in Grim I concluded that "[n]either

the IHO nor the SRO [who examined the latter two IEPs] gave the

appropriate consideration to the experts on dyslexia, who had

personal knowledge of the student in question," it rejected the

officers' assessment that the IEPs met the child's needs.  Id. at

*135-36.  The court also noted that the IHO at the hearing at issue

appeared to have at least partly applied an incorrect burden of proof.  Id.

The district court repeatedly acknowledged its awareness of the need to defer to the administrative officers.  Id. at *3-4, *135.  It did this even though it had held its own hearing on the issues in which "much of the same evidence was presented as at the prior hearings," id. at *92, and thus the court could make its own credibility determinations.  In deciding that the first of the three IEP's was substantively adequate, for instance, the judge wrote, "Although I disagree with the conclusions of the IHO and the SRO, I cannot say that their conclusions do not merit deference." Id. at *126.

The Second Circuit nevertheless reversed, finding that despite its allusion to deference, the district court's judgment "reflects precisely that type of subjective credibility assessment that Rowley held to be inappropriate."  Grim II, 346 F.3d at 383. Specifically citing the district court's remark that neither administrative officer appropriately considered the opinions of the experts who had personally met the child, the Second Circuit wrote, "[T]he District Court impermissibly chose between the views of conflicting experts on a controversial issue of educational policy -- effective methods of educating dyslexic students -- in direct contradiction of the opinions of state administrative officers who had heard the same evidence."  Id.

I question whether the degree of deference to educational administrators required by Grim II and other Second Circuit cases is consistent with the intent of Congress when it passed the IDEA. See S. Conf. Rep. No. 94-455, at 47-48, 50 (1975) (stating that Congress removed the "substantial evidence" standard of review from IDEA in favor of a standard allowing courts to make an "independent decision based on a preponderance of the evidence"); Thomas A. Mayes & Perry A. Zirkel, Allocating the Burden of Proof in Administrative and Judicial Proceedings Under the Individuals with Disabilities Education Act, 108 W. Va. L. Rev. 27, 90-91 (2005). However, I am nonetheless bound by those decisions.

C.    Provision of FAPE

"[W]hen a public school fails to provide a FAPE and a child's parents place the child in an appropriate private school without the school district's consent, a court may require the district to reimburse the parents for the cost of the private education. T.A., ___ U.S. at ___, 129 S. Ct. at 2488. To determine whether parents are entitled to tuition reimbursement, courts use a three-step analysis. A.C., 553 F.3d at 171. They must determine (1) whether the state has complied with the procedural requirements of the IDEA; (2) "whether the proposed IEP is substantively appropriate in that it [was] 'reasonably calculated to enable the child to receive educational benefits;'" and (3) whether the private school in which the child was enrolled is appropriate to meet the child's needs.

Id. (quoting Cerra v. Pawling Central School District, 427 F.3d 186, 192 (2d Cir. 2005)). A court must only reach the third step if it finds that the IEP is procedurally or substantively flawed. Id.

The assignment of the burden of proof in IDEA challenges has recently undergone revision in New York. In Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005), the Supreme Court interpreted the Act to place the burden in administrative hearings on the party seeking review -- in this case, the parents. However, the Court left open the question of whether states can override this default rule by statute. Id. at 61-62. New York has done just that. The State Education Law was revised in 2007 to place the burden of proof on the board of education at the first two steps in the analysis and on the parents at the third. N.Y. Educ. Law § 4404(1)(c); Student X, 2008 WL 4890440, at *2. n.2. The SRO and IHO in this case followed New York's rule (SRO Decision at 7; IHO Decision at 5), and the parties do not dispute this allocation of the burden.

    1.  Procedural Requirements

Procedural inadequacies do not necessarily result in a finding that a child was deprived of a FAPE. Grim II, 346 F.3d at 381; Matrejek v. Brewster Central School District, 471 F. Supp. 2d 415, 419 (S.D.N.Y. 2007). Under the IDEA, a hearing officer may find that a child was denied a FAPE only if procedural flaws: (i) impeded the child's right to a FAPE; (ii) significantly obstructed

the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE; or (iii) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); M.M. ex rel. A.M. v. New York City Department of Education, 583 F. Supp. 2d 498, 505 (S.D.N.Y. 2008); Matrejek, 471 F. Supp. 2d at 419. Therefore, "[o]nly procedural inadequacies that cause substantive harm to the child or his parents –- meaning that they individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP –- constitute a denial of a FAPE." Matrejek, 471 F. Supp. 2d at 419; accord W.S. ex rel. C.S. v. Rye City School District, 454 F. Supp. 2d 134, 138 (S.D.N.Y. 2006).

    As discussed above, Grim II instructs district courts to defer to the IHO's and SRO's determinations regarding procedural as well as substantive issues. See Grim II, 346 F.3d at 382; Matrejek, 471 F. Supp. 2d at 426 (remarking that by not deferring to the determinations of the SRO and IHO regarding the prejudicial impact of the school district's failure to have a middle school teacher present at the CSE meeting, the district judge "would be substituting [her] own uninformed judgment for the opinions of persons with far greater expertise without having any basis to do so, in violation of the law in this Circuit"). It is unclear why such deference is appropriate, given that determining procedural

compliance with the IDEA does not appear to require expertise in the field of education. Nevertheless, the mandate of Grim II must be followed.

### a.  Composition of the CSE

The plaintiffs assert that the development of the IEP was procedurally deficient because the parent waived the inclusion of a parent member in the CSE under duress, and the absence of such a participant in the meeting denied the plaintiffs active participation in the development of the IEP. (Pl. Memo. at 10-11). The IHO found that "the absence of the parent member does not rise to a denial of FAPE as the parent still participated in the development of the IEP and had participated in the development of prior IEPs developed by Committees on Preschool Special Education." (IHO Decision at 7).

The IDEA does not require that a parent member be present at the CSE. 20 U.S.C. § 1414(d)(1)(B); R.R., 2006 WL 1441375, at *5; Mills, 2005 WL 1618765, at *5. New York law, however, does require a parent member, but permits the parent of the student to excuse that parent member's participation in the meeting. N.Y. Educ. Law § 4402(b)(1)(a); 8 N.Y.C.R.R. § 200.3(a)(1)(viii); R.R., 2006 WL 1441375, at *5; Mills, 2005 WL 1618765, at *5.

The plaintiffs contend that although the parent waived the presence of a parent member, that waiver was made under duress and is thus invalid. They explain that at the start of the June 4,

2007 CSE meeting, Dr. Bowser informed the parent that the CSE was unable to secure a parent member; that if the parent did not waive attendance of the parent member, the meeting would need to be rescheduled to an undetermined date in the future; and that D.S.'s IEP should be developed by early June in order to ensure that school placement deadlines were met. (Pl. Memo. at 10; Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl. Response") at 2). L.S. testified that she felt "pressured to have the meeting" and that she "didn't really feel like [she] had a choice" to insist on the parent member's participation. (Tr. at 614).

_____ As evidence of duress, the plaintiffs point to the IHO's statement that "[i]t is unfortunate that the Department encourages parents to waive the participation of a parent member." (Reply to Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Pl. Reply") at 4 (citing IHO Decision at 7)). However, the IHO's statement provides commentary, not proof of duress. Further, courts have upheld parents' waivers of the participation of a parent member under similar circumstances. See R.R., 2006 WL 1441375, at *2-3, *5 (reversing SRO's determination that parent's waiver was inadequate when parent testified that CSE meeting was "chaotic because [there was] no parent rep. [The CSE participants] weren't sure if the parent member was coming or not. I had to sign a waiver."); Mills, 2005 WL 1618765, at *2-3, *5

(finding that waiver of parent member at suggestion of CSE did not constitute procedural defect where parent testified that she asked CSE participants whether hearing would be postponed if she did not sign waiver and they responded affirmatively).

>        b.    Preparation of the IEP

The plaintiffs contend that they were denied meaningful participation in the development of D.S.'s IEP because the CSE failed to rely on current evaluations of D.S.  (Pl. Memo. at 7). At the hearing, L.S. stated that the evaluations that she had asked Dr. Bowser to review were Dr. Agin's from November 1, 2006 and Dr. McCarton's from January 9, 2007.  (Tr. at 670-71).  Specifically, the parents note that although L.S. told Dr. Bowser before the CSE meeting that she possessed these evaluations of D.S., Dr. Bowser declined to look at them before the meeting and did not discuss them at the meeting.  (Pl. Memo. at 7).  The plaintiffs also contend that "[b]ecause the team's recommendation contradicts every evaluation submitted on behalf of D.S., the Department cannot argue that they relied on these evaluations."  (Pl. Reply at 2).

However, the IHO concluded that because these evaluations were noted on the IEP check list, they were taken into account in the preparation of the IEP.  (IHO Decision at 8).  In addition, the fact that the team ultimately made a recommendation that did not conform with the opinions of D.S.'s evaluators is insufficient evidence that their opinions were not taken into account.

Additionally, the parents allege that the school district failed to convene an IEP with an "open mind" and instead predetermined the nature of services to be offered to D.S. (Pl. Memo. at 9). As evidence, they cite the fact that the CSE disregarded the recommendations of D.S.'s treaters without any explanation and instead recommended its "usual and customary" program for autistic children. (Pl. Memo. at 9). They further note that Dr. Bowser testified at the hearing that she was unfamiliar with any DOE programs for autistic children other than 6:1:1 classrooms and, according to L.S., she made a similar statement during the IEP meeting.[16] (Pl. Memo. at 9-10). However, Dr. Bowser also stated at the hearing that she had recommended the 6:1:1 placement with D.S. specifically in mind. (Tr. at 94-95, 156-57).

---

[16] The plaintiffs allege that their position is supported by the DOE's recommendation for D.S. for the 2008-2009 school year. Having ruled out placement in a 6:1:1 classroom, the CSE referred D.S. for private placement. The parents assert that such action on behalf of the CSE buttresses their claim that the 6:1:1 placement was previously suggested for D.S. not because it was appropriate for him but because it was all the DOE had to offer. (Pl. Reply at 8). However, this information could be used to prove the opposite point -- that a CSE team would be willing to recommend a private placement should it believe one is necessary. Additionally, the DOE does not appear to contest that a 6:1:1 placement was the only placement within the system for D.S.; rather the defendant maintains that such a placement was appropriate for D.S.

It should be noted that the parents do not challenge the DOE's position that the recommended placement for D.S. in the 2008-2009 school year has no bearing on the determination of the appropriateness of the IEP prepared for the 2007-2008 school year. (Pl. Reply at 8).

Courts are loath to grant claims of predetermination. <u>See</u> <u>T.P.</u>, 554 F.3d at 251, 253 (reversing district court decision that the school district had impermissibly predetermined the elements of the IEP); <u>A.G.</u>, 2009 WL 806832, at *7; <u>E.G. ex rel. A.G. v. City</u> <u>School District of New Rochelle</u>, 606 F. Supp. 2d 384, 389 (S.D.N.Y. 2009); <u>M.M.</u>, 583 F. Supp. 2d at 506-07.    Only in egregious circumstances where the plaintiffs demonstrate that a district convened a CSE meeting with an entirely closed mind is a claim of predetermination sufficient to overturn an IEP.    <u>See, e.g.</u>, <u>Deal ex</u> <u>rel. Deal v. Hamilton County Board of Education</u>, 392 F.3d 840, 855-58 (6th Cir. 2004) (finding predetermination when "[t]he facts of this case strongly suggest that the School System had an unofficial policy of refusing to provide one-on-one ABA programs and that School System personnel thus did not have open minds and were not willing to consider the provision of such a program").    Although the plaintiffs' claims in this case are troubling, they do not establish impermissible predetermination in view of Dr. Bowser's testimony and the deference afforded SRO and IHO determinations under this Circuit's precedent.

Finally, the parents allege that D.S.'s IEP violated the IDEA's requirement that an IEP be reviewed at least annually and include "a statement of the child's present levels of academic achievement, . . . a statement of measurable annual goals, including academic and functional goals, designed to meet the

child's needs that result from the child's disability . . . and a description of how the child's progress toward meeting the annual goals . . . will be measured." 20 U.S.C. § 1414(d)(1)(A)(i). First, they claim that the IEP, and, more specifically, the goals and short-term objectives set out for D.S. in the IEP were not discussed at the CSE meeting. (Pl. Memo. at 11). Next, they assert that the goals and objectives were recycled from the previous year's IEP and omitted D.S.'s current levels of functioning. (Pl. Memo. at 11).

The IHO found "any photocopying from a prior IEP to be insignificant" as "[t]he record is replete with testimony as to [D.S.]'s very slow learning style, and therefore past information was still accurate." (IHO Decision at 8). Further, she found that even if the goals were inadequate, this deficiency did not give rise to a denial of a FAPE. (IHO Decision at 8). The process of copying D.S.'s goals and short-term objectives is disturbing. Although I understand that D.S. progressed slowly, the goals and objectives were so specific (e.g., "[D.S.] will imitate 10 sounds with 90% accuracy for 2 consecutive days" (6/4/07 IEP at 11; 6/15/06 IEP at 9); "[D.S.] will attend to adults [sic] face, with 90-100% accuracy over 2 consecutive days" (6/4/07 IEP at 12; 6/15/06 IEP at 10); "[D.S.] will roll clay into a snake, 4/5 opportunities" (6/4/07 IEP at 16; 6/15/06 at IEP at 16)) that it seems inappropriate that no adjustment was made to those benchmarks

over the span of a year.  In addition, I share the plaintiffs'
skepticism that all 22 pages of goals and short-term objectives
were reviewed in the course of a 45-minute meeting that was not
solely focused on this information.  Nevertheless, I cannot
disagree with the IHO's ultimate conclusion.  A.C. ex rel. M.C. v.
Board of Education of the Chappaqua Central School District, No. 06
Civ. 4238, 2007 WL 1259145, at *4 (S.D.N.Y. April 27, 2007) ("As
the IHO noted, the fact that some of M.C.'s goals and objectives
were drafted before the CSE meeting in which the final goals and
objective for that year were promulgated did not in itself deny
M.C. a FAPE.").

Finally, the parents also argue that the IEP initiated the
related service of counseling for D.S., but failed to develop any
goals or short-term objectives in that area.  (Pl. Memo. at 11).
Such a flaw is insufficient to find a denial of a FAPE.

## 2.  Substantive Issues

A recommended placement for a disabled child is appropriate if
it is "'reasonably calculated to enable the child to receive
educational benefits.'"  Frank G. v. Board of Education of Hyde
Park, 459 F.3d 356, 364 (2d Cir. 2006) (quoting Rowley, 458 U.S. at
207)).  "While the IDEA does not require states to maximize the
potential of handicapped children, it must provide such children
with meaningful access to education." Id. (internal quotations
omitted).  Thus, a federal court evaluating an IEP must examine the

record for any "'objective evidence' that the student's IEP will afford more than 'trivial advancement' and is 'likely to produce progress, not regression.'" M.M., 583 F. Supp. 2d at 507 (quoting Cerra, 427 F.3d at 195).

D.S.'s parents argue that the IEP was not sufficiently individualized for their son to receive educational benefits. They raise similar points as they did when challenging the procedural adequacy of the IEP: (1) that the IEP was not based on recent evaluations of D.S. because Dr. Bowser refused to look at the evaluations prior to the meeting and they were not discussed at the meeting (Pl. Memo. at 12; Pl. Response at 5); (2) that the IEP was not based on recent evaluations of D.S. because all of these evaluations, including the one prepared by the school district's expert, Ms. Pearl, advised against the team's 6:1:1 recommendation (Pl. Memo. at 12-13; Pl. Response at 5); (3) that the CSE team recommended the 6:1:1 placement simply because that was what Dr. Bowser believed was available (Pl. Memo. at 13); and (4) that the goals and short-term objectives established for D.S. in the IEP were simply copied from a previous IEP and not reviewed at the CSE meeting.  (Pl. Memo. at 11; Pl. Response at 3).

In addition, based on L.S.'s visit to P.S. 94, the parents contend that D.S. could not have progressed at the school.  They argue that the school's staff did not appear qualified to teach D.S., particularly in light of his being a non-verbal child.  As an

illustration, L.S. relayed her observation of the non-verbal child at the school who was not provided with the means to communicate because he was not given access to his PECS book. (Pl. Memo. at 14; Pl. Response at 6). L.S. further notes that when she shared her concerns about D.S.'s communication needs with the principal of P.S. 94, the principal replied that she would "'see if her teachers could get additional training on PECS and an augmentative device, but she wasn't sure what [] would be approved and what they would be able to do.'" (Pl. Memo. at 14; Pl. Response at 6 (quoting Tr. at 633)). The plaintiffs state that because the use of an augmentative device is mandated by D.S.'s IEP, the principal's comment indicates that his IEP could not have been implemented at P.S. 94. (Pl. Memo. at 14). The defendant, however, claims that the staff at P.S. 94 had "extensive experience" with children with autism and could have handled D.S.'s needs. (The Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment ("Def. Response") at 9-10).

Moreover, the plaintiffs argue that D.S.'s placement at P.S. 94 would have created safety concerns. (Pl. Memo. at 13-14). They report that L.S. observed students at the school who were engaging in self-stimulatory behavior, similar to what D.S. engages in, that was being ignored or reinforced by the staff. (Pl. Memo. at 13). They note that D.S.'s IEP makes it clear that D.S. "'must be carefully supervised throughout the day due to the lack of safety

awareness. [D.S.] also puts objects from his environment into his mouth.'" (Pl. Memo. at 13-14 (quoting 6/4/07 IEP at 28)).  The parents allege that after L.S. expressed concern to the school's principal about D.S.'s safety, the principal stated that a 1:1 paraprofessional would be required to supervise him individually in the 6:1:1 classroom.  (Pl. Memo. at 14; Pl. Response at 7).  However, the plaintiffs note that the IEP makes no such recommendation and assert that D.S. would not have been provided with this supervision had he attended P.S. 94.  (Pl. Memo. at 14; Pl. Response at 7).  Thus, they conclude that "the IEP team acknowledged D.S.'s safety concerns on the IEP document, but failed to provide him with the services necessary to keep him safe." (Pl. Memo. at 14).

In response, the DOE asserts that the CSE was aware of D.S.'s self-stimulatory and other negative behaviors and believed these would be addressed by the 6:1:1 program and related services. (Def. Response at 9).  It notes that Dr. Bowser testified that she thought the recommended program would be beneficial for the child because he would have appropriate behaviors to imitate, an element lacking in a 1:1 program.  (Def. Response at 9 (citing Tr. at 111)).  The DOE also points out that Ms. Campbell testified that she could have addressed D.S.'s goals in her classroom and that she had never worked with a child who had not made progress in a group setting.  (Def. Response at 8 (citing Tr. at 315)).  Further, the

defendant explains that Ms. Campbell testified to the benefits of a group setting, specifically that it would allow D.S. to interact with his peers and learn social skills while also receiving one-on-one attention. (Def. Response at 8 (citing Tr. at 315)).

The parents maintain that "D.S. gains only minor and incidental benefit from being exposed to other students on the autistic spectrum. He does not learn appropriate behaviors or independently interact with other students without 1:1 facilitation. D.S. can only derive both academic and nonacademic benefits in a 1:1 instructional setting." (Pl. Memo. at 14-15; Pl. Reply at 2, 7). They respond to Dr. Bowser's assertion that she hoped D.S. would learn the "typical" skills of a kindergartner by explaining that D.S. was not a typical kindergartner and that treating him as such deprived him of an IEP based on his individual needs. (Pl. Reply at 6-7).

I agree with the plaintiffs that it is doubtful that D.S.'s IEP was sufficiently individualized. I further share their concern that D.S. would not progress at P.S. 94. The only people who testified that D.S. would benefit from a placement in a 6:1:1 classroom had never met him. Those who had met and evaluated him insisted that he required 1:1 ABA therapy in order to progress. There was also substantial evidence that D.S. would likely regress without constant individualized attention and with other children in the classroom to distract him. In making these observations, I

am mindful of my lack of expertise in the field of educational policy. However, such conclusions do not require "the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." M.S., 231 F.3d at 102 (quoting Walczak, 142 F.3d at 129). Rather, typical judicial experience is the primary qualification necessary to determine if the IHO and SRO properly grappled with the evidence before them. Although I understand that these administrative officers' experience in the field of education has secured them deference from federal courts, it is curious that experts with experience working with the child at issue do not receive similar deference. Nevertheless, having closely examined Grim II and similar cases in this Circuit, I find myself constrained to defer to the determination of the IHO and SRO.

Conclusion

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and the plaintiffs' motion be denied. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Lewis A. Kaplan, Room 1310, and to the chambers of the undersigned, Room 1960, 500

Pearl Street, New York, New York 10007.  Failure to file timely

objections will preclude appellate review.

                         Respectfully submitted,

                         James C. Francis IV

                         JAMES C. FRANCIS IV
                         UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       March 12, 2010

Copies mailed this date:

Jesse C. Foley, Esq.
Skyer, Castro, Foley & Gersten, Esq.
276 Fifth Avenue
New York, New York  10001

Andrew Rauchberg, Esq.
New York City Law Department
100 Church Street
New York, New York  10007